IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 17, 2013 Session

## IN RE: SHYRONNE H., ET AL.

### Direct Appeal from the Circuit Court for Shelby County
No. CT-00207410     John R. McCarroll, Judge

### No. W2012-02188-COA-R3-PT - Filed April 30, 2013

Mother appeals the trial court's termination of her parental rights with respect to the six children at issue in this appeal. She concedes that grounds exist for termination, but she claims that termination is not in the children's best interest. We affirm the decision of the trial court.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Andrew L. Wener, Memphis, Tennessee, for the appellant, Danielle H.

Robert E. Cooper, Jr., Attorney General and Reporter, Leslie Curry, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services

## OPINION

### I.  FACTS & PROCEDURAL HISTORY

This parental termination case has a lengthy and unusual procedural history.  It involves six children who were born to Danielle H. ("Mother") between 1998 and 2007.[1] The incident that gave rise to these proceedings occurred on July 23, 2008.  While the six children were in Mother's care at her home, the youngest child, fifteen-month-old Derrix, suffered a very serious head injury.  As a result of the injury, Derrix was permanently disabled.  He is now blind, confined to a wheelchair, and unable to speak or walk.  He regularly suffers from seizures, and he has a gastric feeding tube, in addition to a tracheostomy tube to enable him to breathe.

Due to Derrix's injury, the children were removed from Mother's home and placed with the maternal grandmother.  In October 2008, Mother was indicted for aggravated child neglect and endangerment and for aggravated abuse of a child under eight years old, based on the incident involving Derrix.  The six children were placed in the temporary custody of the Department of Children's Services ("DCS") on November 12, 2008, and they were placed in foster homes.

In December 2008, DCS filed a petition in the juvenile court for Shelby County requesting that the children be declared dependent and neglected.  In an order filed on July 7, 2009, the juvenile court determined that all six children were dependent and neglected in accordance with Tennessee Code Annotated section 37-1-102(b)(12)(F) and (G).[2]  The juvenile court also determined that all six children were victims of "severe child abuse" as defined by Tennessee Code Annotated section 37-1-102(b)(23)(A) as a result of the severe physical abuse of Derrix by Mother.[3]  Based on these findings, the juvenile court ordered that the children would remain in DCS custody and that Mother could have no contact with them.

---

[1]  Mother also has two children who were born to her after these six children were removed, but they are not at issue on appeal.

[2]  These provisions provide that a child may be considered dependent and neglected if the child "is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others," Tenn. Code Ann. § 37-1-102(b)(12)(F), or if the child "is suffering from abuse or neglect."  Tenn. Code Ann. § 37-1-102(b)(12)(G).

[3]  Tennessee Code Annotated Section 37-1-102(b)(23)(A) defines severe child abuse as "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm or death and the knowing use of force on a child that is likely to cause great bodily harm or death."

Mother appealed these findings to the circuit court for Shelby County.

On April 23, 2010, DCS initiated the case before us by filing a petition to terminate Mother's parental rights, also in circuit court.[4] The petition described the dependency and neglect proceedings that had taken place in juvenile court and noted that Mother's de novo appeal of those proceedings was currently pending in another division of circuit court. The termination petition alleged numerous grounds for termination of Mother's parental rights. Relevant to this appeal, it alleged severe child abuse, pursuant to Tenn. Code Ann. § 36-1-113(g)(4), which provides:

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian[.]

While the termination case was pending, Mother pled guilty to the lesser offense of aggravated assault of a child and was sentenced to six years in prison. By way of an amended petition, DCS alleged an additional ground for termination based on Mother's sentence for severe child abuse, pursuant to subsection (g)(5), which provides:

> The parent or guardian has been sentenced to more than two (2) years' imprisonment for conduct against the child who is the subject of the petition, or for conduct against any sibling or half-sibling of the child or any other child residing temporarily or permanently in the home of such parent or guardian, that has been found under any prior order of a court or that is found by the court hearing the petition to be severe child abuse, as defined in § 37-1-102.

Tenn. Code Ann. § 36-1-113(g)(5).[5] Through appointed counsel, Mother filed an answer

---

[4] The petition also sought termination of the parental rights of the children's six fathers. The trial court eventually terminated all six father's parental rights, and those decisions are not at issue on appeal.

[5] The other grounds asserted against Mother were: abandonment by failure to contribute to the support of the children pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(i); abandonment by an incarcerated parent pursuant to Tenn. Code Ann. §§ 36–1–113(g)(1) and 36-1-102(1)(A)(iv); substantial non-compliance with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2); and persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3). One of these grounds was later
(continued...)

denying all of DCS's claims, asserting multiple affirmative defenses, and denying that it would be in the best interest of the children for her parental rights to be terminated.

On November 9, 2010, the circuit court, Judge Karen R. Williams presiding, heard the de novo appeal of the juvenile court's dependency and neglect adjudication. In an order filed the next day, on November 10, 2010, the circuit court found that the six children were dependent and neglected "on the basis of the severe injuries Derrix suffered in the custody of his mother." The court also concluded that the children were victims of severe child abuse based on the "knowing exposure of a child to or failing to protect a child from abuse or neglect that is likely to cause great bodily harm or death."

On the same day that Judge Williams entered the order finding the six children dependent and neglected and victims of severe child abuse, the trial of the parental termination case began in the other division of circuit court. Circuit Court Judge John R. McCarroll, Jr. presided over the termination proceedings. With regard to the alleged grounds for termination based on severe child abuse and sentencing for severe child abuse, DCS argued that it was not required to present evidence to prove that severe abuse had occurred, because the circuit court's order, entered that morning, conclusively decided that issue and was entitled to preclusive effect under the doctrine of *res judicata*. Mother's attorney objected, arguing that, because the dependency and neglect order had been entered that same day, it was not a final order subject to *res judicata* because it could be appealed or revised within thirty days of its entry. The trial court ultimately agreed with DCS, and it relied on the circuit court's order as establishing that severe child abuse had occurred. The trial court proceeded with a two-day trial on the other issues, including the alternative grounds for termination not pertinent to this appeal, the best interest of the children, and various issues involving the children's fathers. Thereafter, the trial court entered an order finding, based upon Judge Williams's order, that there was clear and convincing evidence of severe child abuse, Tenn. Code Ann. § 36-1-113(g)(4), and sentencing for severe child abuse, Tenn. Code Ann. § 36-1-113(g)(5), to establish grounds for termination of Mother's parental rights. The trial court also found by clear and convincing evidence that it was in the children's best interest to terminate Mother's parental rights, and it awarded guardianship of the children to DCS.

Mother appealed the termination case to this Court. She also appealed the order entered in the separate circuit court proceedings in which the court had found the children to be dependent and neglected and victims of severe child abuse. Due to an unexplained

---

[5](...continued)
withdrawn by DCS, and the trial court found the others had not been proven by clear and convincing evidence. Those rulings are not challenged on appeal.

delay in the transmittal of the trial court's record of the dependency and neglect proceedings to this Court, we heard the appeal of the termination case first. Mother argued that the trial court erred in excluding evidence relevant to the allegation of severe child abuse under the doctrine of res judicata on the basis that the issue had been fully litigated in the de novo dependency and neglect hearing, which was held in the circuit court the day before. We agreed. We explained that, in Tennessee, "a judgment from a case in which an appeal is pending is not final and cannot be res judicata until all appellate remedies have been exhausted." ***In re Shyronne D.H.***, No. W2011-00328-COA-R3-PT, 2011 WL 2651097, at *6 (Tenn. Ct. App. July 7, 2011). Accordingly, we held that the dependency and neglect order (which was entered on the morning of the termination trial and ultimately appealed) was not conclusive on the issue of severe child abuse under the doctrine of res judicata. We concluded that "[u]nder the unique procedural circumstances of this case, it was incumbent upon the trial court to allow Mother to fully litigate whether she committed severe child abuse sufficient to provide grounds for termination under Tennessee Code Annotated Sections 36–1–113(g)(4)–(5)."[6] ***Id.*** at *10. We concluded that Judge McCarroll had exclusively relied on Judge Williams's order instead of making an independent finding that Mother had committed severe child abuse, and because no evidence or argument was allowed regarding the issue, we vacated the trial court's order and remanded for further proceedings. Our opinion in this regard was issued on July 7, 2011.

---

[6] As noted above, the ground set forth in Tenn. Code Ann. § 36-1-113(g)(4) provides:

> The parent or guardian has been found to have committed severe child abuse as defined in § 37–1–102, *under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse . . . .*

(emphasis added). Similarly, Tenn. Code Ann. § 36-1-113(g)(5) states:

> The parent or guardian has been sentenced to more than two (2) years' imprisonment for conduct against the child who is the subject of the petition, or for conduct against any sibling or half-sibling of the child or any other child residing temporarily or permanently in the home of such parent or guardian, *that has been found under any prior order of a court or that is found by the court hearing the petition to be severe child abuse*, as defined in § 37-1-102.

(emphasis added). As we explained in the first appeal of this matter, "[Mother's] criminal conviction for aggravated assault, standing alone, is not a sufficient ground for termination under section 36-1-113(g)(5). Rather, some court order, either by a prior court or the court hearing the termination petition, must find that the conduct underlying the conviction constituted severe child abuse as defined by section 37-1-102." ***In re Shyronne D.H.***, 2011 WL 2651097, at *9.

Before the termination case was heard on remand, the separate dependency and neglect proceedings made their way to the Tennessee Supreme Court. On January 19, 2012, the Supreme Court issued its decision in *In re DeAndre C.*, No. W2011-00037-SC-R11-JV, 2012 WL 161845 (Tenn. Jan. 19, 2012) (designated "Not for Publication").[7] The Supreme Court found clear and convincing evidence that Mother severely abused Derrix, but it concluded that there was not clear and convincing evidence to prove that she severely abused the remaining five children simply because they were present in the home when she injured Derrix. *Id.* at *2. Nevertheless, the Court concluded that all six children were dependent and neglected, stating, "The fact that [Mother] has been found to have severely abused one of her children supports the conclusion that the other children remaining in her custody are in danger of being subjected to similar abuse and, therefore, that they are dependent and neglected under Tenn. Code Ann. § 37-1-102(b)(12)(F)." *Id.* at *3.

The post-remand hearing of the termination case took place before Judge McCarroll on September 10, 2012. Because the Supreme Court's opinion had, by that time, become final, Mother conceded that the issue of severe child abuse had been conclusively determined, and that the Supreme Court's decision barred further litigation of the issue under the doctrine of *res judicata*. The trial court heard "updated" testimony as to the children's best interest. Mother had been paroled effective March 16, 2012, and she testified at the hearing. The trial court also heard testimony from the children's DCS case manager, from the foster mother for Derrix, and from the foster mother for four of the other siblings. The trial court entered an order terminating Mother's parental rights on December 5, 2012. The court again found clear and convincing evidence to establish grounds for termination because of severe child abuse, Tenn. Code Ann. § 36-1-113(g)(4), and sentencing for severe child abuse, Tenn. Code Ann. § 36-1-113(g)(5). The court also found clear and convincing evidence that termination of Mother's parental rights was in the children's best interest, based upon the evidence previously submitted during the two-day trial in 2010 and the "updated" evidence it heard on remand. Mother timely filed a notice of appeal.

## II. ISSUE PRESENTED

On appeal, Mother concedes that grounds existed for terminating her parental rights. However, she claims that the trial court erred in finding that there was clear and convincing

---

[7] DeAndre is one of the two children born to Mother after these six children were removed. He was also the subject of a dependency and neglect petition, although it was filed separately from the petition addressing these six children, and then consolidated for hearing. Two identical orders were entered as a result, one for DeAndre, and one for the six other children. Although DeAndre is not one of the children at issue in this appeal, it appears that the Supreme Court may have considered the identical dependency and neglect orders in its appeal and chose to title the case under the name of the single child involved in the other order, even though its opinion addressed these six children.

evidence to prove that termination was in the best interest of the children.

## III. STANDARD OF REVIEW

In Tennessee, proceedings to terminate a parent's parental rights are governed by statute. *See* Tenn. Code Ann. § 36-1-113. "Parties who have standing to seek the termination of a biological parent's parental rights must prove two things." *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005); *see also* ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). First, they must prove the existence of at least one of the statutory grounds for termination, which are listed in Tennessee Code Annotated section 36-1-113(g). ***Id.*** Several grounds for termination are listed in subsection (g), but the existence of any one of the grounds enumerated in the statute will support a decision to terminate parental rights. ***In re S.R.C.***, 156 S.W.3d 26, 28 (Tenn. Ct. App. 2004); ***In re J.J.C.***, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). ***In re Audrey S.***, 182 S.W.3d at 860. Because no civil action carries graver consequences than a petition to sever family ties forever, both of the elements for termination must be proven by clear and convincing evidence. ***Id.*** at 860-61. In sum, "[t]o terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." ***In re F.R.R., III***, 193 S.W.3d 528, 530 (Tenn. 2006) (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)).

## IV. DISCUSSION

### A. Grounds

Although Mother concedes on appeal that grounds for termination were proven, we briefly note that we have reviewed the evidence and found that grounds for termination do, in fact, exist. Mother "has been found to have committed severe child abuse as defined in § 37-1-102, under [a] prior order of a court" due to the injuries suffered by Derrix, who is one of the children at issue in this petition and the half-sibling of the other children. Therefore, grounds existed pursuant to Tennessee Code Annotated section 36-1-113(g)(4). In addition, grounds were proven pursuant to subsection (g)(5) because Mother was "sentenced to more than two (2) years' imprisonment for conduct against [Derrix,]" a child who is the subject of the petition and the half-sibling of the other children, and such conduct "has been found under [a] prior order of a court . . . to be severe child abuse, as defined in § 37-1-102." Tenn. Code Ann. § 36-1-113(g)(5).

### B. Best Interest

Now we turn to the issue on appeal – the best interest of the children. On appeal, Mother argues that DCS put on "no proof" regarding the children's best interest and instead relied exclusively on the fact that she had committed severe child abuse as support for its position on the children's best interest. She also argues that the trial court erred in finding clear and convincing evidence that termination was in the best interest of the children, because, according to Mother, the only best interest factor that weighed against her was the factor addressing abuse. We disagree with both of Mother's assertions.

The Tennessee legislature has provided a list of nine factors for the trial court to consider when determining whether termination is in a child's best interest.[8] *See* Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005) (citing *State v. T.S.W.*, No. M2001-01735-COA-R3-JV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002)). "Every factor need not be applicable in order

---

[8] The factors set forth in Tenn. Code Ann. § 36-1-113(i) include:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

for the trial court to determine that it is in the best interest of the child for a parent's right[s] to be terminated." *In re B.A.C.*, 317 S.W.3d 718, 727 (Tenn. Ct. App. 2009) (citing *In re D.C.A.*, No. M2008-01279-COA-R3-PT, 2009 WL 837877, at *8 (Tenn. Ct. App. Mar.30, 2009)). The weight and relevance of the factors varies from case to case, and it is possible that a single factor may be determinative. *Id.*

At the remand hearing in September 2012, the DCS case manager for the six children, Shewronda Stringer, along with two of the foster parents, testified about the children's history and their current situation. The trial court also considered the testimony from the previous two-day trial, at which Mother, Ms. Stringer, a foster parent, and some of Mother's family members testified. By the time of the remand hearing in 2012, the children had been in DCS custody for almost four years, since November 2008. Derrix was five years old at the time of the hearing, and he had been in the same foster home for nearly four years. Four of the other siblings were living together in another foster home. One of those four children has Down's Syndrome. The sixth child was not placed in a foster home with his siblings because he had been identified as a "sexually reactive child," meaning, he displayed inappropriate sexual behaviors. Likewise, Ms. Stringer testified that Derrix was not placed with the other children because of his medical conditions and his need for individual attention and in-home nursing.

Derrix's foster mother testified that he remains confined to a wheelchair, with a gastric feeding tube and a breathing tube, and he is unable to see or speak. She testified that Derrix has "seizures constantly" and requires medication. She testified that Derrix has a nurse to care for him during the day and that she cares for him at night. She explained the importance of monitoring and suctioning his trach tube during the night and noted that he "can't do anything for himself." Derrix's foster mother testified that she has a good relationship with Derrix and considers him to be "just like my child." She added, "And, you know, it seems like he cares a lot for me too." She testified that she hoped to adopt Derrix in the event that Mother's parental rights were terminated.

The foster mother of the four siblings who live together testified as well. She testified that the child with Down's Syndrome initially did not speak well, or understand things that were said to him, when he came to live with her, but that he "has come a long ways" and his speech has improved to the point where people can now understand "almost everything" he says. At age 13, she said he can now answer the telephone. The foster mother testified that another one of the children initially struggled with "a lot of behavior issues" such as stealing and lying, when he first came to her home. She testified that another child was required to repeat kindergarten but had since become an honor student. The foster mother testified that the other child, the only girl of the six siblings, was having some difficulty in school, but was being tutored. The foster mother testified that she had developed a strong bond with the four

children and considered them part of her family, and that she and her husband hoped to adopt them in the future. She testified that the four children had regular visits with the other two siblings, and that she intended to continue those visits in the future.

The case manager, Ms. Stringer, testified that the children's initial behavioral issues had improved. She testified that all of the children had received counseling. She testified that the child who was identified as sexually reactive had made significant progress as well, although he was not in a pre-adoptive home because of "some issues" he had. Ms. Stringer said that an adoption recruitment had taken place for the child, in an effort to identify an adoptive home that could meet his special needs, but that the previous appeals in this matter "put a halt to that for [him]."

Ms. Stringer testified that it had been two years since the children had "seen" Mother. As noted above, in July 2009, the juvenile court had ordered that Mother could have no contact with the children after finding that they were dependent and neglected and victims of severe abuse. In addition, Ms. Stringer testified that Mother had verbally threatened to hit her (Ms. Stringer) in the presence of the children following a hearing in September 2009. As a result of that incident, a restraining order and no contact order was entered prohibiting Mother from coming onto DCS property or contacting Ms. Stringer.[9]

Ms. Stringer testified that she believed that it would not be in the children's best interest to place them in an environment where safety would be a concern, as it would in a home with Mother. Ms. Stringer referenced the abuse of Derrix that led to the children entering DCS custody, Mother's verbal threats against Ms. Stringer, and Mother's history of exposing the children to domestic violence. In the past, Mother had been involved in an abusive relationship with Derrix's father, and she allowed him to live with her and the children despite the abuse. Mother had also been convicted of domestic assault of her sister in 2006 or 2007. Ms. Stringer testified that the Exchange Club had performed a mental health and parenting assessment of Mother and concluded that her history of violence indicated she was "high risk for physical abuse." Ms. Stringer similarly opined that Mother's history of violent behavior was a threat to the children.[10]

At the time of the remand hearing in 2012, Mother had been released on parole for about six months. Mother testified that she lived with her sister after being released from prison, and that she had moved into an apartment with her fiancé and her two-year-old child

---

[9] Ms. Stringer's supervisor assisted her in handling the case thereafter, and he was available for Mother to contact in order to avoid the need for Mother to communicate with Ms. Stringer.

[10] The trial judge found Ms. Stringer to be "very forthright" and "a credible witness."

approximately ten days prior to the hearing. She testified that she had not been in trouble since her release and that she was regularly seeing her parole officer and a therapist. Mother testified that she had obtained a job at a local restaurant, where she had worked for the past four to five months. She testified that while she was prison, she had voluntarily attended every class that was offered, including anger management because of her past domestic violence charge, a health and fitness class, a program designed to help convicted felons re-enter society, and moral recognition therapy, which she described as a group-type therapy where participants talk about their past problems. Mother said she was also attending "drug anonymous" classes. Mother admitted that she had a history of smoking marijuana, which began when she was 18 years old because her first child had died. (Mother was about 32 years old at the time of trial.) She admitted to smoking marijuana during her relationship with Derrix's father between 2006 and 2008. Mother also mentioned that she had given birth to her seventh child while in prison, and that it was determined by DCS that she had marijuana in her system when she gave birth.

Mother admitted that she had been in an abusive relationship with Derrix's father and that the children were exposed to the violence. She stated, "He used to fight me in front of them." Mother said that while she was pregnant with Derrix, his father choked her with an extension cord until she passed out, and he threw her into a table, which caused her to go into labor at 27 weeks gestation. Mother also said that Derrix's father shot at her, locked her and the children in a house, and threatened to kill her if she left. Mother said she had Derrix's father arrested based on the incident, and that he was currently incarcerated for aggravated assault, false imprisonment of her and the children, and burglary for breaking into a house when he found out where she and the children were. Mother testified that two of the other children's fathers were also incarcerated. One of the children's fathers had been killed in a homicide. Mother ended her relationship with another father when he started using heroin. Mother acknowledged her conviction for domestic violence against her sister, but she claimed that she and her sister had reconciled since that time. Mother denied that she threatened Ms. Stringer and claimed that she simply informed Ms. Stringer that "you're going to mess around with the wrong people's children and they are going to slap you."

Mother described her contact with the children over the past four years as, "None." Mother did not testify during these proceedings about the incident that gave rise to Derrix's injury, due to the issue of *res judicata*. She did say that she entered a best interest plea to aggravated assault because she was facing the possibility of a sixty-year sentence if she went to trial and lost. Although Mother did not testify about the manner in which Derrix was injured, the order terminating Mother's parental rights contains findings regarding the nature of the incident based upon the other courts' findings in the dependency and neglect proceedings. The termination order states:

. . . Derrix, Jr. was admitted to Le Bonheur Hospital after [Mother] reported that, around six o'clock in the morning, the child fell off the bed, hit his head on the corner of a dresser, and then hit the floor. Derrix had significant swelling to the brain and was not breathing on his own. [Mother] reported that after the child fell, he became faint, vomited, and stopped breathing. She reported that she called 911 and was told to begin cardiopulmonary resuscitation (CPR) until the ambulance arrived. Derrix arrived at the hospital unaccompanied by an adult, and [Mother] arrived a few hours later. The hospital stated that the child's injuries were not consistent with [Mother's] story, and that Derrix, Jr. was in very critical condition. He had an unexplained bruise to his chest that appeared to be a thumbprint. The computed tomography (CT) scan revealed superatentoerial cerebral edema likely consistent with hypoxic ischemic brain injury. An eye examination revealed extensive retinal hemorrhages, and a skeletal survey was still pending. The clinical findings were consistent with abusive head trauma, and, in light of the seriousness and life-threatening nature of the injury, the hospital found the injury unlikely to be a result of a simple fall and suspicious of non-accidental trauma.

Later in the trial court's termination order, with regard to best interest, the court found that Mother "has shown brutality and physical abuse toward Derrix . . . as more fully stated above." This finding was in regard to the sixth best interest factor found in Tennessee Code Annotated section 36-1-113(i), which requires consideration of "[w]hether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household[.]" The trial court's order also stated, "The Court determined the other eight enumerated factors do not apply to the case at bar." On appeal, Mother basically complains that DCS and the trial court placed too much emphasis on the incident giving rise to Derrix's injuries. At oral argument before this Court, her attorney conceded that the abuse of Derrix occurred but claimed that the fact that Mother "had a bad day" on one occasion should not be the controlling factor in deciding the children's best interest.

Based on the severity and extent of Derrix's lifelong injuries, we find that the "brutality and physical abuse" shown by Mother, on that single day, provides a basis for finding by clear and convincing evidence that termination of Mother's parental rights was in the children's best interest. As explained in *In re Audrey S.*, 182 S.W.3d 838, 878-79 (Tenn. Ct. App. 2005):

Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of

-12-

whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, *depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.*

(Emphasis added) (citation omitted). As the Supreme Court recognized in the appeal of the dependency and neglect proceedings involving these children, "The fact that [Mother] has been found to have severely abused one of her children supports the conclusion that the other children . . . are in danger of being subjected to similar abuse[.]" 2012 WL 161845, at *3. One "bad day" for Mother led to a lifetime of disabling injuries for Derrix. Neither Derrix nor the other children should be subjected to the risk of further physical abuse by Mother.

Furthermore, we find that a consideration of the other best interest factors does not lead to the conclusion that Mother's parental rights should not be terminated.[11] While Mother claims to have made an adjustment of her circumstances and conduct, she admits that it would not be possible for the children to be returned to her at this time. In fact, one of the special conditions of Mother's parole is that she is to have no unsupervised contact with her children. At the time of the remand hearing, Mother had had virtually no contact with the children in nearly four years. Mother had only been living independently for ten days. She claimed that the home was safe for the children, but given the history of drug use and violence in the home, it is impossible for us to conclude that the home is safe after only ten days. Especially given the special needs of Derrix, and the child with Down's Syndrome, and the behavioral issues of the other children when they arrived in their foster homes, it is unlikely that Mother would be in a position to care for the children in the near future.[12] Removing the children from their now-stable environment would likely have a detrimental effect on their progress.

---

[11] Although the trial court's order stated that the other eight best interest factors were inapplicable, the trial court made numerous factual findings in its order that are relevant to the other factors and to the children's best interest in general. The order discusses in detail Mother's troublesome relationships with the children's fathers, Mother's domestic assault on her sister, the threat against Ms. Stringer, Mother's lack of a work history, the children's behavioral issues when they came into DCS custody, their current situations, and their prospects for adoption. During the trial, the trial judge indicated that he had not heard many termination cases, and he candidly stated that he was still somewhat unfamiliar with all of the requirements of such cases. In his oral discussion of the best interest factors, it appears that the judge was under the impression that each factor had to be proven by DCS by clear and convincing evidence in order for it to "apply." The transcript indicates that the judge thoroughly considered the best interest factors, and ultimately, he decided that the most relevant factor was the one pertaining to abuse.

[12] Mother does not argue that we should consider the six children's interests separately (such as the possibility of returning one or some of the children rather than all six).

-13-

Mother complains that DCS could have done more to assist her and that she did all that she was required to do in order to improve her lifestyle. However, as the Supreme Court noted in *In re DeAndre C.*, 2012 WL 161845, at *3 (Tenn. Jan. 19, 2012): "A parent's severe abuse of one child relieves the Department of its obligation to reunite the parent with the abused child or any of the child's siblings." (citing Tenn. Code Ann. § 37-1-166(g)(4)(A) (2010); Tenn. Code Ann. § 36-1-102(9) (2010) ("Aggravated circumstances" includes aggravated assault.)).

Keeping in mind that the children's best interest must be viewed from the children's, rather than the parent's, perspective, *In re Audrey S.*, 182 S.W.3d at 878, we readily find, by clear and convincing evidence, that termination of Mother's parental rights is in the best interest of the six children.

## V.   CONCLUSION

For the aforementioned reasons, the decision of the circuit court is hereby affirmed. Costs of this appeal are taxed to the appellant, Danielle H., for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.